## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PHILLIP C. LAMSON,

        Plaintiff,

    v.                                  Case No. 11-C-663

EMS ENERGY MARKETING SERVICE, INC.,

        Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  PROCEDURAL BACKGROUND

This action was commenced on July 12, 2011, when the plaintiff, Phillip C. Lamson ("Lamson"), filed a complaint naming EMS Energy Marketing Service, Inc. ("EMS") as the defendant.  Lamson's complaint seeks relief for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*.

In Count One of the complaint Lamson alleges that "EMS violated the FCRA, 15 U.S.C. § 1681b(b)(2)(A)(I), because it obtained a consumer report for employment purposes on Lamson and all other similarly situated individuals without providing a clear and conspicuous written notice to each individual of its intent to obtain a consumer report before doing so in a document that consists solely of that disclosure."  (Compl. ¶ 46.)

In Count Three of the complaint[1] Lamson alleges that "EMS violated the FCRA, 15 U.S.C. § 1681b(b)(3)(A)(I), because it failed to provide a copy of the consumer report used to make an

---

[1] Count Two of the complaint has since been withdrawn by the plaintiff.

employment decision to Lamson and all other similarly situated individuals before taking an adverse action that was based in whole or in part on that report." (Compl. ¶ 50.)

In Count Four of the complaint Lamson alleges that "EMS violated the FCRA, 15 U.S.C. § 1681b(b)(3)(A)(ii), because it failed to provide Lamson and all other similarly situated individuals the summary of rights required by this section of the FCRA before taking an adverse action that was based in whole or in part on a consumer report." (Compl. ¶ 52.)

The plaintiff's complaint was met with a motion to dismiss. However, on December 29, 2011, the court denied the motion, finding that such motion was predicated on certain extrinsic evidence and, without considering such extrinsic evidence (which the court could not properly do on a motion to dismiss), the plaintiff's complaint stated a claim upon which relief could be granted.

Not to be deterred, on January 12, 2012, the defendant filed a motion for summary judgment seeking dismissal of the complaint, and each and every claim set forth therein. Accompanying the defendant's motion was a brief as well as a set of proposed findings of fact. The plaintiff responded by filing his own brief in opposition to the motion, together with a response to the defendant's proposed findings, as well as his own set of proposed findings of fact, and certain declarations. On March 5, 2012, the defendant filed its reply brief. Thus, the defendant's motion is now fully briefed and is ready for resolution. For the reasons that follow, the defendant's motion will be granted. [2]

## II. FACTUAL BACKGROUND

In accordance with Civil Local Rule 56(b) (E.D. Wis.), the defendant filed a set of proposed findings of fact. A review of those proposed findings together with the plaintiff's responses thereto,

_____

[2] On January 6, 2012, the plaintiff filed a motion for class certification. But on January 23, 2012, the parties stipulated to a stay in the briefing on that motion pending the court's decision on the defendant's motion for summary judgment. On January 24, 2012, the court entered an order granting the relief called for in the stipulation.

2

as well as the plaintiff's additional proposed findings together with the defendant's responses thereto, demonstrate that the following facts are undisputed (at least for purposes of the summary judgment motion).

Plaintiff Lamson is a resident of the Eastern District of Wisconsin. Defendant EMS is a New Hampshire corporation that does business in the Eastern District of Wisconsin.

Lamson saw a job advertisement by EMS in the Milwaukee Journal Sentinel newspaper on October 11, 2009, that said:

**$ Money, Money, Money $**

Registration Workers Needed. $21+/hr. EMS an authorized vendor for AT&T has 15 positions to fill by Friday. Training available - Performance based. Call Today, Start Tomorrow! (414)755-3432

(Pl.'s Proposed Statement of Add. Facts ("PPSAF") ¶ 1.)

On or about October 15, 2009, Lamson applied for an independent contractor sales position with EMS. On or about October 15, 2009, Lamson interviewed with Mr. Pat Cooper of EMS. Lamson took a sales position with EMS on or about that same date. On or about October 15, 2009, Lamson signed an "Authorization to Obtain Consumer Report," which provided, among other provisions, "I release EMS, its agents, contractors and employees from any liability in connection with obtaining such reports."

On or about October 16, 2009, after taking the sales position, Lamson signed and dated an "Independent Contractor Agreement," under which he agreed that he was "an independent contractor and not . . . an employee . . . ." (Hutchinson Decl. ¶ 2, Ex. A, ECF No. 11-1.)

EMS terminated Lamson's relationship with the company on or about November 16, 2009. After EMS terminated Lamson's relationship with the company, Lamson received a letter and background check report in the mail directly from Backgroundchecks.com. The report showed that

EMS obtained a background report on Lamson on or about November 4, 2009, for the purpose of his "employment, contract, volunteer, or other relationship." (Lamson Decl. ¶ 4, ECF No. 32-1.)

EMS failed to provide Lamson with a copy of the report prior to terminating his relationship with EMS. EMS failed to provide Lamson a written description of his rights under the FCRA as prescribed by the Federal Trade Commission prior to terminating his relationship with EMS.

April Mitchell-Bo was Lamson's field supervisor. During daily training, EMS told Lamson and others what they were to say during sales calls in scripted sales presentations. EMS gave sales representatives a hat to wear, written materials to present, an EMS Identification Badge and told them what they could and could not wear. EMS said that they could not wear jeans, had to wear khakis or black pants, and could not wear gym shoes when making sales calls.

EMS provided Lamson, as it did with all sales representatives, his list of leads from which he could make sales calls, and he could not call on any other prospects other than the list EMS provided. EMS told Lamson he could not sell any other products other than AT&T U-verse product that EMS was contracted to sell. EMS prohibited sales representatives from making or using their own sales material. EMS provided all the sales materials and even an electric outlet tester for Lamson to use during sales calls, and he could not use anything else other than what EMS provided.

If Lamson made a sale, EMS required him to use the customer's phone to call the sale in to the Call Center. Although EMS required sales representatives to have a mobile phone with them, EMS prohibited Lamson and other sales representatives from using his or her own phone unless the customer did not have a home phone. Lamson was also required to check in at the end of every day with a report on his activity.

4

When EMS terminated Lamson, it did not give him prior notice that it obtained a background check on him from a consumer reporting agency and did not give him notice of his rights under the FCRA or a copy of the report.

The text of the document which Lamson signed and which is at the heart of the defendant's motion for summary judgment reads, in pertinent part, as follows:

### *INDEPENDENT CONTRACTOR AGREEMENT*

This independent Contractor Agreement (the "Agreement") is between EMS ENERGY MARKETING SERVICE, INC. (the "Company") and Phillip Lamson. Date: 10/16/09.

Independent Contractor Status

You have been expressly hired as an independent contractor and not as an employee, agent, joint venturer or partner of the Company for any purposes whatsoever, including federal and state tax purposes. You shall not hold yourself out as acting in any other capacity for us. You are not authorized to bind or incur any obligation on behalf of the Company.

You shall not be entitled to any benefits which the Company may make available to its employees from time to time. As an independent contractor, you shall be solely responsible for all state and federal income taxes, unemployment insurance and social security and other taxes. YOUR RELATIONSHIP WITH THE COMPANY DOES NOT QUALIFY YOU FOR MINIMUM WAGE, WORKER'S COMPENSATION OR UNEMPLOYMENT BENEFITS. It is your responsibility to comply with all federal, state and local laws and licensing requirements.

Term

Subject to the provisions of this Agreement, this Agreement shall have a term beginning on the date of acceptance by the Company and ending on one year from the date thereof (the "Anniversary date"). This Agreement may be renewed on an annual basis on each Anniversary date subject to acceptance by the Company which acceptance can be withheld in its sole discretion in accordance with the then current renewal policy of the Company as set forth in the Policies and Procedures.

Duties

For these purposes, your work for the Company will be considered as a "Direct Seller[.]"[] Direct selling activities ("Services") are expected to include selling or soliciting the sale of certain consumer products and services to any buyer on a buy-

sell basis, a deposit-commission basis, or any similar basis prescribed by regulation. In this connection, you agree to return weekly to the Company all completed customer application forms for products and services sold by you.

You have control over the time you choose to solicit the sale of products and services. You are not required to solicit the sale of products or services at any specific hours or for any fixed number of hours. It is understood and agreed that the Company's payment for your Services is directly related to the amount of sales generated and not the number of hours worked.

You agree that you will apply yourself diligently to complete the direct selling projects given to you. In the performance of Services to the Company, you are expected to exercise independent judgment and have the authority to control and direct the performance of the details of the Services, the Company being interested only in the results obtained. However, the Services contemplated herein must meet the Company standards and approval and shall be subject to the Company's general inspection and guidance to ensure that your work is proper, complies with the Company requirements to meet its specifications, and is completed in a timely manner.

You shall abide by all applicable federal, state and local laws or regulations, and the terms of this Agreement, the Policies and Procedures and the Compensation Plan.

. . .

<u>Your Income</u>

For each customer application form for services or products sold properly completed by you, signed by the customer and approved by us, you will be paid compensation according to the current pay structure attached hereto and incorporated herein by reference (the "Compensation Schedule"). Commissions are paid only after the Company receives confirmation of sale from the third party vendors. The Company will hold _0_% of commissions each month in a reserve, for _0_ days, which will be adjusted periodically after cancellations or returns. If a customer cancels its product or service order prior to the payment of your commissions on the cancelled sale, you will not be paid a commission on the cancelled sale.

<u>Your Expenses</u>

The Company will not reimburse you for any expenses incurred by you. You are also expected to supply any tools, equipment, or supplies that may be necessary to accomplish these Services. You shall be responsible for paying all expenses incurred by you in providing the Services hereunder.

6

<u>Assignment</u>

Neither this Agreement nor any duties or obligations under this Agreement may be assigned by the Company or you without prior written consent. The Company may assign this Agreement at any time.

(ECF No. 11-1.)

Furthermore, the text of the "Authorization to Obtain Consumer Report," which Lamson signed on October 15, 2009, reads as follows:

I hereby authorize Energy Marketing Services, Inc. ("EMS") and other persons or firms acting on its behalf to procure consumer reports in conjunction with my application to provide direct selling services to EMS. The term "consumer report" means a written, oral, or other communication prepared by a consumer reporting agency that may include information concerning character, general reputation, personal characteristics (including my driving record, criminal history, etc.) or mode of living. I understand that such reports may be compiled through information from court records, departments of motor vehicles, past or present employers or educational institutions, government, occupational, licensing or registration agencies, business or personal references, and other sources necessary to verify information I have furnished to EMS.

I release EMS, its agents, contractors and employees from any liability in connection with obtaining such reports.

To assist EMS in the proper identification of my file and/or review of records, I have sent [sic] forth below certain information which EMS and others acting on its behalf may use in conjunction with reviewing my background and/or completing the consumer reports to be prepared for EMS.

(Hutchinson Decl. ¶ 3, Ex. A, ECF No. 11-2.)

### III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

8

# IV. DISCUSSION

The relevant provisions of the FCRA for this lawsuit are found at 15 U.S.C. §1681b. They are sections 1681b(b)(2)(A) and 1681b(b)(3)(A). Section 1681b(b)(2)(A) reads as follows:

> (2) Disclosure to consumer.
>
> > (A) In general. Except as provided in subparagraph (B), a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless -
> >
> > > (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
> > >
> > > (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

In turn, section 1681b(b)(3)(A) reads as follows:

> (3) Conditions for use in adverse actions.
>
> > (A) In general. Except as provided in subparagraph (B), in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates -
> >
> > > (i) a copy of the report; and
> > >
> > > (ii) a description in writing of the rights of the consumer under this title, as prescribed by the Bureau under section 609(c)(3).

Finally, 15 U.S.C. § 1681a(h) provides that

> [t]he term "employment purposes" when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee.

9

EMS's motion for summary judgment is predicated on two grounds: (1) Lamson applied for an independent contractor position and the FCRA does not apply to independent contractors; and (2) even if it did, Lamson authorized EMS to obtain the report and agreed to release EMS from any liability associated with its alleged use of the consumer report.

According to the defendant, the above-cited provisions of the FCRA apply only when the consumer report is being used "for employment purposes." Thus, if EMS's alleged use of the consumer report was not "for employment purposes," Lamson's claims have no merit. And because EMS's use of the consumer report was for the purpose of considering Lamson as an independent contractor, and not for an employment position, Lamson's FCRA claims must be dismissed.

In response, the plaintiff argues that

[t]he facts show that the relationship between Mr. Lamson and EMS satisfies the common law agency test to establish the existence of an employer-employee relationship for purposes of the FCRA because of the significant control EMS exercised over Mr. Lamson, among other factors. In the alternative, the FCRA covers independent contractor relationships. The Court should not find that Mr. Lamson has released his claims, as the release upon which EMS relies is invalid as a matter of law and, even if it were not, the scope of the release does not include Mr. Lamson's claims.

(Pl.'s Br. 1.)

In assessing the merits of the defendant's motion the first place to look is the statute. The unambiguous language of section 1681a(h) makes clear that the FCRA (or at least the sections of the FCRA upon which the plaintiff relies for his claims) applies to use of a consumer report for the purpose of "evaluating a consumer for employment, promotion, reassignment or retention <u>as an employee</u>." 15 U.S.C. § 1681a(h) (emphasis added). It therefore follows that if the facts in this case are such that a reasonable trier of fact could not find that the consumer report that was obtained by

EMS was used by EMS to evaluate Lamson for a position <u>as an employee</u> of EMS, summary judgment must be granted to the defendant.

To be sure, the plaintiff does not dispute that he signed the "Independent Contractor Agreement." Nor does he deny that the Agreement states that he was "expressly hired as an independent contractor and not as an employee, agent, joint venturer or partner of the Company for any purposes whatsoever, including federal and state tax purposes." (ECF No. 11-1.) Rather, he argues that the nature and degree of actual control that EMS exercised over him while he worked in the sales position rendered him an employee of EMS, even though the Agreement says he was an independent contractor.

More precisely, Lamson asserts, relying on his and April Mitchell-Bo's declarations, that

EMS exercised control over almost every facet of the work Mr. Lamson performed on its behalf. They controlled the hours he worked, the products and services he provided and the prices of those products and services, prohibited other products from being sold, restricted Mr. Lamson to a set list of prospects each day, what he said during sales presentations, where he could go to the bathroom, what phone he could use, all the marketing materials and his attire which identified him as an EMS representative, not an independent business of his own. EMS hired Mr. Lamson to sell its sole product, the AT&T U-verse package. EMS provided all of the equipment Mr. Lamson used in performing his duties. Mr. Lamson did not have the authority to hire other people to do the work assigned to him by EMS. EMS provided Mr. Lamson with the training he needed to perform his job, and in fact this training (and its timing) were mandatory and at its location. EMS advertised the position in the Milwaukee Journal Sentinel, and it did not say that the relationship was as an independent contractor. It was not until after EMS hired Mr. Lamson that it presented him with the Independent Contractor Agreement, attempting to make his relationship an independent contractor.

(Pl.'s Br. 10.)

The first matter to address is the test that the court should apply in assessing whether the plaintiff has presented sufficient evidence to raise a genuine issue of fact as to whether he was an employee or, instead, an independent contractor.

11

In *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559 (7th Cir. 2009), the court had occasion to address the various tests that can be applied in determining whether a particular individual is an employee or, rather, an independent contractor. In *Suskovich*, the plaintiff had pursued common law claims, as well as claims under ERISA and the Fair Labor Standards Act ("FLSA"). *Id.* at 565. The court noted that there are slightly different tests for each of those claims.

> ERISA cases use a 12-factor common law standard to determine if a party to a lawsuit was an employee under the act. The Supreme Court has held that this standard is similar to the 10-factor Restatement test. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). FLSA cases, meanwhile, are decided utilizing a broader definition of employee than the common law, and determine whether an arrangement is an employment or independent contractor relationship with a six-factor test to determine the "economic reality" of the situation. *Secretary of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987).

553 F.3d at 565. The court of appeals then proceeded to apply the 10-factor Restatement test in *Suskovich*, following the lead of the district court. In doing so the court of appeals noted that "[g]iven that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from *Darden*, that test provides the best means of resolving the main employment question before us." *Id.* [3] Just as in *Suskovich*, the pivotal question in this case revolves around Lamson's employment status. Unlike in *Suskovich*, however, there are no common law claims in the instant case. Instead, the only claims that Lamson asserts are predicated on a federal statute. Thus, I am reluctant to apply the Restatement test to the facts of this case.

By the same token, however, I am reluctant to apply the six-factor test that is applied in FLSA cases in determining whether a person is to be considered an "employee" for purposes of the FCRA.

---

[3] Significantly, the court also noted that the plaintiff in *Suskovich* invoked "the Restatement test in its arguments and briefs and thus . . . waived any argument that the broader FLSA standard ought to apply to this case." 553 F.3d at 565 n.1.

In *Darden*, the court found there to be a difference in how the term "employee" should be construed when comparing the meaning of that term under ERISA and under the FLSA.

> At oral argument, Darden tried to subordinate [*Community for Creative Non-Violence v.*] *Reid* [, 490 U.S. 730 (1989)] to *Rutherford Food Corp. v. McComb*, 331 U.S. 722 . . . (1947), which adopted a broad reading of "employee" under the Fair Labor Standards Act (FLSA). And *amicus* United States, while rejecting Darden's position, also relied on *Rutherford Food* for the proposition that, when enacting ERISA, Congress must have intended a modified common-law definition of "employee" that would advance, in a way not defined, the Act's "remedial purposes." . . . But *Rutherford Food* supports neither position. The definition of "employee" in the FLSA evidently derives from the child labor statutes, . . . and, on its face, goes beyond its ERISA counterpart. While the FLSA, like ERISA, defines an "employee" to include "any individual employed by an employer," it defines the verb "employ" expansively to mean "suffer or permit to work." . . . This latter definition, whose striking breadth we have previously noted, . . . stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles. ERISA lacks any such provision, however, and the textual asymmetry between the two statutes precludes reliance on FLSA cases when construing ERISA's concept of "employee."

503 U.S. at 325-26 (internal citations omitted).

Thus, in *Darden* the court ruled that in determining whether a person is to be considered an "employee" under ERISA a court should apply a common-law test. That test is as follows:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product [i.e., task] is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring the party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Id.* at 323-24 (quoting *Reid*, 490 U.S. at 751-752.) Moreover, "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* at 324 (quoting *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 258 (1968)).

Because Lamson asserts neither common law claims nor claims under the FLSA, I believe the proper test to apply in assessing the nature of Lamson's work relationship with EMS is the common-law test set forth in *Darden*. And so I will apply that test, as set forth below.

*1. The Task to be Accomplished*

First of all, the task to be accomplished in this case was the sale of AT&T U-verse services to potential customers. Thus, what must be assessed is the degree of control that EMS had the right to exercise over Lamson's efforts to sell such services.

The skill required for the sale of U-verse services is almost entirely a matter in the hands of the salesperson. One can be trained to sell (just as one can be trained to sculpt, as was the situation in *Reid*), but in the end it is the salesperson's skill that brings about a successful sale. This factor thus weighs somewhat in favor of Lamson's being an independent contractor.

*2. The Source of Instrumentalities and Tools*

The next factor to consider is the source of the instrumentalities and tools used to accomplish the task. This is really not a particularly relevant factor to consider in the context of this lawsuit. Unlike the sculptor in *Reid*, Lamson did not use tools in the traditional sense to accomplish the sales task. That having been said, he was provided a hat to wear, written materials to present, and an EMS Identification Badge. EMS provided all the sales materials and even an electric outlet tester for Lamson to use during sales calls, and he could not use anything else other than what EMS provided. Thus, this particular factor weighs somewhat in favor of an "employee" finding.

*3. The Location of the Work*

The next factor to consider is the location of the work. This factor weighs in favor of an independent contractor finding. To be sure, EMS may have given him leads, but when and where to contact those leads was entirely up to Lamson. Lamson was not required to show up at the offices

14

of EMS.  All that he was required to do was check in at the end of every day with a report on his activity and return to EMS on a weekly basis all completed customer applications.   That he had such latitude is expressly set forth in the Agreement.

> [Y]ou agree to return weekly to the Company all completed customer application forms for products and services sold by you.
>
> You have control over the time you choose to solicit the sale of products and services. You are not required to solicit the sale of products or services at any specific hours or for any fixed number of hours.  It is understood and agreed that the Company's payment for your Services is directly related to the amount of sales generated and not the number of hours worked.
>
> You agree that you will apply yourself diligently to complete the direct selling projects given to you.  In the performance of Services to the Company, you are expected to exercise independent judgment and have the authority to control and direct the performance of the details of the Services, the Company being interested only in the results obtained.  However, the Services contemplated herein must meet the Company standards and approval and shall be subject to the Company's general inspection and guidance to ensure that your work in proper, complies with the Company's requirements to meet its specifications, and is completed in a timely manner.

(ECF No. 11-1.)

Thus, this particular factor weighs in favor of finding Lamson to be an independent contractor.

*4. The Duration of the Relationship of the Parties*

The next factor to consider is the duration of the relationship between the parties.  In this case the expected duration of the relationship is spelled out in the Agreement.  The relationship was to be for one year, subject to "be[ing] renewed on an annual basis on each Anniversary Date subject to acceptance by the Company which acceptance can be withheld in its sole discretion in accordance with the then current renewal policy of the Company as set forth in the Policies and Procedures." (ECF No. 11-1.)  In other words, it was to be for a specific term.  More to the point, however, in the instant case the actual duration was less than one month.  In other words, this was not the sort of

relationship that had been extant for an extensive period of time and one that had necessarily been relied upon by the parties to continue indefinitely into the future. Thus, this factor does not weigh in favor of finding the relationship to be one of employer-employee.

*5. The Right of the Hiring Party to Assign Additional Projects*

The next factor to consider is whether the hiring party has the right to assign additional projects to the hired party. This particular factor is pretty much a "non-factor." The responsibilities given to Lamson under the Agreement were straight-forward: Lamson was to be a "direct-seller"; and he was " expected to exercise independent judgment and have the authority to control and direct the performance of the details of the Services, the Company being interested only in the results obtained." (ECF No. 11-1.) The Agreement does not speak to any other "projects" being assigned to Lamson. He was to sell, and that was his sole responsibility. Moreover, nothing presented by the parties demonstrates that Lamson was given any additional responsibilities or "projects."

*6. The Extent of the Hired Party's Discretion*

The next factor to consider is the extent of the hired party's discretion over when and how long to work. To be sure, the plaintiff argues (and the undisputed facts demonstrate) that during daily training, EMS told Lamson and others what they were to say during sales calls in scripted sales presentations. EMS gave sales representatives a hat to wear, written materials to present, an EMS Identification Badge and told them what they could and could not wear. EMS said that they could not wear jeans, had to wear khakis or black pants, and could not wear gym shoes when making sales calls. Furthermore, EMS provided Lamson, as it did with all sales representatives, his list of leads from which he could make sales calls, and he could not call on any other prospects other than the list EMS provided. EMS told Lamson he could not sell any other products other than AT&T U-verse product which EMS was contracted to sell. EMS prohibited sales representatives from making or

using their own sales material. EMS provided all the sales materials and even an electric outlet tester for Lamson to use during sales calls, and he could not use anything else other than what EMS provided.

> All that having been said, however, the Agreement expressly and unambiguously states:

> You have control over the time you choose to solicit the sale of products and services. You are not required to solicit the sale of products or services at any specific hours or for any fixed number of hours. It is understood and agreed that the Company's payment for your Services is directly related to the amount of sales generated and not the number of hours worked.

(ECF No. 11-1.)

Such being the case, this particular factor weighs heavily in favor of a finding of independent contractor status.

*7. The Method of Payment*

The next factor to consider is the method of payment. The Agreement sets forth how Lamson was to be compensated for his work, and it was not on an hourly, daily, bi-weekly, or even monthly basis. Rather, how much Lamson was to be paid was conditioned solely on the amount of sales he made.

> Your Income

> For each customer application form for services or products sold properly completed by you, signed by the customer and approved by us, you will be paid compensation according to the current pay structure attached hereto and incorporated herein by reference (the "Compensation Schedule"). Commissions are paid only after the Company receives confirmation of sale from the third party vendors. The Company will hold _0_% of commissions each month in a reserve, for _0_ days, which will be adjusted periodically after cancellations or returns. If a customer cancels its product or service order prior to the payment of your commissions on the cancelled sale, you will not be paid a commission on the cancelled sale.

(ECF No. 11-1.)

Such method of payment suggests an independent contractor relationship much more than a traditional employer-employee, master/servant relationship.

## 8. The Hiring Party's Role in Hiring and Paying Assistants

The next factor to consider is the hired party's role in hiring and paying assistants. The Agreement does not really speak to his factor. The closest that the Agreement comes to addressing this issue is found in the following provision:

> Assignment
>
> Neither this Agreement nor any duties or obligations under this Agreement may be assigned by the Company or you without prior written consent. The Company may assign this Agreement at any time.

(ECF No. 11-1.)

In my opinion, this provision does not prohibit Lamson from hiring assistants to help him.

To be sure, in her declaration, April Mitchell-Bo avers that "EMS hired and assigned each of the team members that worked for me. I was not permitted to get my own team members without EMS hiring them first." (Mitchell-Bo Decl. ¶ 10.)

But, unlike Lamson who was a salesman, Mitchell-Bo was a field supervisor of salespeople. Moreover, that Mitchell-Bo was not allowed to hire her own salespeople does not mean that she could not have paid someone out of her own pocket to, for example, help keep her documentation organized. Such being the case, this particular factor is not of any material significance in the court's analysis.

## 9. The Regular Business of the Hiring Party

The next factor to consider is whether the work is part of the regular business of the hiring party. To be sure, the work being performed by Lamson was part of the regular business of EMS.

Case 2:11-cv-00663-WEC   Filed 04/12/12   Page 18 of 23   Document 38

But, once again, this factor is not of any real significance in the analysis, as it would be were Lamson a sculptor (as was the plaintiff in *Reid*).

*10. Whether the Hiring Party is in Business*

The next factor to consider is whether the hiring party is in business. Once again, EMS is in business, and Lamson is part of that business. But, this particular factor is of no material significance in the court's analysis.

*11 & 12. The Provision of Employee Benefits and Tax Treatment*

The final two factors to consider are the provision of employee benefits and the tax treatment of the hired party. These two factors weigh heavily in favor of a finding of independent contractor.

First of all, there is no evidence of any "employee benefits" being offered to Lamson, i.e., no 401(k), no IRA, and no health insurance. This strongly suggests that Lamson is an independent contractor and not an employee.

Furthermore, the Agreement itself makes clear that Lamson is not entitled to any employee benefits. It also makes clear that EMS is not withholding any income tax or social security tax from Lamson's compensation checks, i.e., that his tax liability is his, and his alone.

> You shall not be entitled to any benefits which the Company may make available to its employees from time to time. As an independent contractor, you shall be solely responsible for all state and federal income taxes, unemployment insurance and social security and other taxes. YOUR RELATIONSHIP WITH THE COMPANY DOES NOT QUALIFY YOU FOR MINIMUM WAGE, WORKER'S COMPENSATION OR UNEMPLOYMENT BENEFITS. It is your responsibility to comply with all federal, state and local laws and licensing requirements.

(ECF No. 11-1.)

In the end, after a full and fair consideration of all of the above factors, I am persuaded that that Lamson was an independent contractor, and not an employee. Furthermore, in my opinion, no reasonable trier of fact could find otherwise.

19

As previously stated, the unambiguous language of section 1681a(h) makes clear that the FCRA (or at least the sections of the FCRA upon which the plaintiff relies for his claims) applies to use of a consumer report for the purpose of "evaluating a consumer for employment, promotion, reassignment or retention <u>as an employee</u>." Thus, because the consumer report in this case was used for the purpose of evaluating Lamson <u>as an independent contractor, and not as an employee</u>, it necessarily follows that his claims must be dismissed.

But the plaintiff argues that, even assuming he is an independent contractor, the FCRA nevertheless applies to him. For that further reason, he argues that the defendant's motion for summary judgment should be denied.

In support of his position that the FCRA covers independent contractors as well as employees, Lamson relies principally on *Hoke v. Retail Credit Corporation*, 521 F.2d 1079 (4th Cir. 1975), cert. denied, 423 U.S. 1087 (1976). In *Hoke*, the court held that a report that was obtained by the Texas Board of Medical Examiners from defendant Retail Credit Corporation to aid in its assessment of the plaintiff's application for a license to practice medicine in Texas was a consumer report within the meaning of that term under the FCRA. During the course of its analysis the court observed in a footnote:

> If we were to apply the common-law concept of employee, we would undoubtedly conclude that a physician who practiced his profession as a sole practitioner or as a member of a medical partnership was an independent contractor, and not an employee, because of the absence of control over the manner in which he afforded expert medical services. But in construing FCRA, we are cognizant of its broad remedial purposes, 15 U.S.C. § 1681, and we are not constrained to limit its application by the common-law concept of master and servant. *N.L.R.B. v. Hearst Publications*, 322 U.S. 111, 64 S. Ct. 851 (1944); *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255 (4[th] Cir. 1974).

521 F.2d at 1082, n. 7. Moreover, the court went on to find that the phrase "as an employee" found in 15 U.S.C. § 1681a(h) modified only the word "retention" and did not modify in any way the words

"employment, promotion [or] reassignment" that also preceded it in that statutory section. *Id.* at 1082.  In conclusion, the court found that the plaintiff physician (even assuming that he was an independent contractor and not an employee) should be "afforded the opportunity to prove his case" under the FCRA.  *Id.* at 1084.

The plaintiff also cites two informal opinion letters issued in 1998 by two different lawyers for the Federal Trade Commission (which up until July 26, 2011, regulated the implementation of the FCRA; since that date, the Consumer Financial Protection Bureau has regulated its implementation).  (Pl.'s Index, Apps. 4-5, ECF No. 34-4, 34-5.)  In those two letters, the lawyers opined that certain job positions, as presented to them, were covered by the FCRA.  But those two letters, in and of themselves, are of limited, if any, persuasive power.

First of all, the second letter (the Solomon letter) relied on the first letter (the Allison letter) for it conclusion.  Second, the Allison letter relied on *Hoke* to support its conclusion.  Finally, the Solomon letter expressly stated that "[t]he views set forth in this informal staff opinion are those of the staff and are not binding on the Commission."  (ECF No. 34-5.)  Likewise, the Allison letter expressly stated: "This is an informal staff opinion and is not binding on the Commission."  (ECF No. 34-4.)  In the end, therefore, it all comes down to *Hoke,* and in my opinion, *Hoke* is no longer sound law.

As already discussed, in 1992 (17 years after *Hoke* was decided) the Supreme Court issued its decision in *Darden*.  In *Darden*, the Court reiterated the "well established" principle (which principle had been applied in *Reid* (decided in 1989, also after *Hoke*)) that

> "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms . . . .  In the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."

21

503 U.S. at 322-23 (internal citations omitted.)

Application of the Supreme Court's decision in *Darden* requires that this court infer that Congress meant to incorporate into 15 U.S.C. § 1681a(h) the common law meaning of employee when it drafted that provision to read: "The term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." Thus, in assessing whether a person is indeed "an employee" for purposes of the FCRA, the court is to apply the common-law test that is set forth in *Darden* (as this court has already done). If such person does not meet that test, it necessarily follows that he or she is not covered by the FCRA. For the reasons set forth above, Lamson is just such a person.

Finally, the plaintiff argues that the release that he signed did not effectively release EMS from liability to him in connection with its alleged use of the consumer report. But, because the court has already found that Lamson was not covered by the FCRA, there is no need to address that particular argument.

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment will be granted, and the plaintiff's complaint and this action will be dismissed.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for class certification be and hereby is **DENIED** as moot;

**IT IS FURTHER ORDERED** that the plaintiff's complaint and this action be and hereby are **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this <u>12th</u> day of April 2012 at Milwaukee, Wisconsin.

**BY THE COURT**:

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge